UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAJIRI TURNER,<br><br>         Petitioner,<br><br>   v.<br><br>ROBERT NEUSCHMID,<br><br>         Respondent. | Case No. 20-cv-06324-WHO (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Dkt. No. 20 |

## INTRODUCTION

Petitioner Tajiri Turner seeks federal habeas relief from his state convictions for robbery and other crimes. His claim of actual innocence is unsupported; his claim that the police used an impermissibly suggestive identification procedure is undone by the reliability of witness's identification and the soundness of the procedure used; his claims of ineffective assistance show neither a deficient performance nor prejudice; and he has not shown that false evidence was presented at trial. The petition for habeas relief is DENIED.

## BACKGROUND

In 2016, Turner was convicted by a San Mateo County Superior Court jury of one count of kidnapping to commit robbery, three counts of second degree robbery, two counts of simple kidnapping, and one count of dissuading a witness by threat or force. (Ans., State Appellate Opinion, Dkt. No. 16-28 at 6.)[1] The jury also found true all sentencing enhancement allegations. (*Id.*) A sentence of 144 years to life was imposed. (*Id.*)

---

[1] *People v. Turner*, No. A148401, 2018 WL 2455447 (Cal. Ct. App. Jun. 1, 2018.)

In 2018, on direct appeal, the two counts of simple kidnapping were reversed; the case was remanded to the trial court to modify the abstract of judgment to award 84 days of presentence conduct credits; and the judgment was otherwise affirmed. (*Id.*) The state supreme court denied Turner's petition for direct review. (Ans., Dkt. No. 16-31 at 2.)

In March 2019, on remand, the superior court dismissed the simple kidnapping counts; imposed sentence on the two counts of second degree robbery that had been stayed; and resentenced Turner to 144 years to life. (*Id.*, Dkt. No. 16-33 at 173-177.) Turner appealed. (*Id.* at 167.) The state appellate court denied the appeal he filed after resentencing, and the state supreme court denied his petition for direct review. (*Id.*, Dkt. No. 16-40 at 2-3.) Turner's state petitions for collateral review were denied. (*Id.*, Dkt. No. 16-32 at 3-4; Dkt. No. 16-37 at 2; Dkt. No. 16-39 at 2.)

The state appellate court summarized Turner's crimes as follows:

> [Turner] was charged with robbing three cell phone stores in San Mateo County using a similar modus operandi. The first such robbery occurred at a Radio Shack in San Bruno on February 13, 2014; the second at another Radio Shack in San Bruno on May 14, 2014; and the third at a Verizon store in San Mateo on September 3, 2014. The prosecution also presented evidence that [Turner] committed three additional cell phone store robberies, in San Francisco, San Mateo and Alameda Counties, respectively.

(*Id.*, State Appellate Opinion, Dkt. No. 16-28 at 3.)

As grounds for federal habeas relief, Turner alleges (i) new evidence shows he is actually innocent; (ii) the identification procedure violated due process; (iii) trial counsel rendered ineffective assistance; and (iv) false, manipulated, and planted evidence was presented at trial in violation of due process.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

**i.      Claim of Actual Innocence**

Turner claims that he is innocent of the Verizon store robbery. (Pet., Dkt. No. 1 at 25.) The facts of the crime were summarized by the state appellate court:

> On September 3, 2014, Yuanjiun Men was working alone at a Verizon store in San Mateo. [Turner] entered at about 11:00 a.m., wearing a hat and backpack. [Turner] approached the counter and asked Men for information about opening a cell phone account. Men advised [Turner] he would need to visit a different store and, initially, [Turner] turned to leave. However, he

3

>then closed the store door and pointed a gun at Men. [Turner] told Men he wanted all the cell phones in the store. Scared, Men walked toward the back room, as [Turner] placed his hand at her collar. Confused from her fear, Men first took [Turner] to the employee break room, about 19 feet from the front counter, before correcting herself and taking him to the inventory room where the phones were kept, about four feet from the front counter. The inventory room, where the cell phones were kept in a locked closet, had no windows. Once there, Men realized the key to unlock this closet was in a drawer at the front counter, so she walked back to the front counter and retrieved it. Men then returned to the inventory room and complied with [Turner]'s order to unlock the closet and to load the phones into his duffel bag. Once she had placed about 16 or 17 cell phones in his duffel bag, [Turner] told her to leave the inventory room and they walked back toward the break room. At some point during their walk, Men noticed [Turner] looking away, so she took the opportunity to run out the back door, screaming for help. [Turner], in turn, went out the door behind her and escaped in his car. After this incident, Men suffered from constant fear and nightmares.

(Ans., State Appellate Opinion, Dkt. No. 16-28 at 5.)

At trial, several witnesses testified they saw the suspect run or walk to an old green Camaro and drive away. (*Id.*, Reporter's Transcript, Dkt. No. 16-15 at 21, 25, 163-164; Dkt. No. 16-16 at 53, 106-107.) The police found the car about ten minutes after the robbery and stayed to watch it. (*Id.*, Dkt. No. 16-16 at 119-123.) A few hours later, Symone Bullock, with Turner in her passenger seat, drove up to the car. (*Id.* at 123-128.) He exited the vehicle, walked to the Camaro, and rummaged around via the passenger side window. (*Id.*, Dkt. No. 16-16 at 126-127.) An officer walked toward Turner, identified himself, and yelled "Stop, police." Turner ran, but was soon apprehended after a chase. (*Id.* at 128-130, 132; Dkt. No. 16-17 at 27-38.) A set of car keys that fit the Camaro was found on him. (*Id.*, Dkt. No. 16-17 at 131.)

Turner claims that he has new evidence showing he did not rob the Verizon store. (Pet., Dkt. No. 1 at 28.) This evidence is an affidavit from John Sanford, a prisoner at Solano State Prison, who states that he committed the Verizon store robbery. (Pet., Sanford Affidavit, Dkt. No. 1-1 at 2-4.) According to the affidavit, Turner picked Sanford up on the day of the robbery so that Sanford could take Turner's car to a friend to have it fixed. (*Id.* at 2.) The pair drove to a T-Mobile store "in the San Mateo area" where Turner

4

had his cell service reconnected. (*Id.*) At 10:30am, Sanford dropped Turner off at CSM, where he had business to attend to, and promised to pick him up at noon, after the car had been fixed.[2] (*Id.*) Rather than taking the car to be fixed, Sanford drove to "the Verizon store on El Camino Real in San Mateo," which he had "case[d]" a few days earlier, and robbed it at gunpoint. (*Id.*) After the robbery, he parked the car in an alleyway in San Mateo, removed the hat and hoodie he had been wearing and put them in a garbage bag, placed the car keys under the passenger seat, left the phones and the BB gun he had used to simulate a real gun during the robbery, exited the vehicle and took the garbage bag with him. (*Id.*) When he returned to San Francisco, Sanford sent a message to Turner through Snapchat saying that he "[f]ucked up" and the car was "hot," though he did not tell Turner exactly what he had done. (*Id.* at 3.) He later learned that Turner had been blamed for the robbery at "1701 Gum Street[,] San Mateo." (*Id.*) Sanford avers that he acted alone and that Turner is innocent of the robbery. (*Id.*)

This evidence failed to convince the state superior court sitting in habeas review:

> Petitioner has not presented 'new evidence.' The purported involvement of John Sanford could have been discovered prior to trial through the exercise of due diligence. According to John Sanford's statement, Petitioner and Sanford were in Petitioner's vehicle at 10:30 am on the morning of the robbery. Testimony at trial asserted that the robbery for which Sanford implicates himself started at or after 11 am and that Petitioner retrieved the vehicle later that afternoon. This vehicle was identified by multiple witnesses as being at the parking lot of the store where the robbery took place. Additionally, Sanford asserts in his statement that he communicated to Petitioner that the vehicle was 'hot.' Consequently, Sanford's purported use of the vehicle and his communication to Petitioner that the car 'was hot,' would have alerted Petitioner to Sanford's possible involvement in the robbery for which Petitioner had been accused. If Sanford's statement is credible, then failing to pursue information from Sanford shows a lack of diligence. Thus, the statement by John Sanford either lacks credibility or fails to constitute new evidence.

(Ans., Order Denying State Superior Court Habeas Petition, Dkt. No. 16-32 at 4.) At the resentencing hearing in March 2019, the superior court found Sanford's statement

---

[2] The affidavit does not state what CSM stands for.

5

"completely uncredible." (Ans., Reporter's Transcript, Dkt. No. 16-34 at 130.)

"'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "Actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)). A petitioner can make a showing of "actual innocence" by presenting the court with new evidence which raises a sufficient doubt as "to undermine confidence in the result of the trial." *Schlup*, 513 U.S. at 324. *Schlup* requires a petitioner "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggen v. Perkins*, 569 U.S. 383, 399 (2013).

A federal habeas petitioner must tie his actual innocence claim to a constitutional error in the underlying criminal proceedings. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "[S]uch evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963).

Habeas relief is not warranted on this claim, even if actual innocence could be brought as a freestanding habeas claim.[3] As the superior court noted, the evidence does not qualify as new. Sanford's telling Turner that the car was "hot" and that he "[f]ucked up" would have alerted Turner at the time of his arrest that Sanford was involved in the

---

[3] Turner attempts to link the evidence to a claim the police used an impermissibly suggestive identification procedure. (Pet., Dkt. No. 1 at 31.) This claim is addressed in the next section of this Order. However, even if the Sanford evidence could be linked to the presentation of false evidence claim, the evidence still does not qualify as new.

6

1  Verizon robbery.  Turner knew Sanford had Turner's car on the day and during the time of

2  the robbery, that the car was in the San Mateo area, and that the car had been tied to the

3  robbery.  In addition, the state superior court's factual determination that the evidence is

4  not new is presumed correct.  28 U.S.C. § 2254(e)(1); *Marshall v. Lonberger*, 459 U.S.

5  422, 431-436 (1983).  The state court's rejection of this claim was reasonable and is

6  entitled to AEDPA deference.  This claim is DENIED.

### ii.     Claim Regarding Identification Procedure

Turner claims that the police used impermissibly suggestive procedures in the process for identifying the suspect for the Verizon store robbery.  (Pet., Dkt. No. 1 at 23.)  He offers the following facts in support of his claim.  Police officers present at the store with Men, the victim, got a radio call about two hours after the robbery.  (*Id.*)  It was audible to the victim of the robbery and stated that the suspect was in custody.  (*Id.*)  The officers told Men that the person responsible had been caught and they would take her to where the suspect was located so that she could make an identification.  (*Id.*)

According to the trial record, during the investigation at the store, Men told the police the perpetrator was "an African-American male in his 20s, wearing dark clothing, dark jeans, and a dark hood."  (Ans., Reporter's Transcript, Dkt. No. 16-19 at 26.)  After she had calmed down a bit, she mentioned that his underwear was "sticking up out of his jeans."  (*Id.* at 27.)  She said they were "plaid and that they were possibly blue and green."  (*Id.*)  Men's initial description had been broadcast earlier, and an officer updated the broadcast with the information about the suspect's underwear.  (*Id.*)

While the police were at the store, the suspect's vehicle was located and photographed.  (Ans., Reporter's Transcript, Dkt. 16-19 at 26, 27-28.)  A copy of the photograph was sent to Sergeant Noa at the store, who showed the photograph to Men.  (*Id.* at 28.)  She and the other witnesses (Aca and Serrano) identified it as the car they had seen leaving the store earlier that day.  (*Id.*)

Roughly three and half hours after the robbery, police at the store were informed that a suspect had been detained.  (*Id.* at 29-30.)  Turner's contention that the radio

1    broadcast said "the person responsible had been caught" does not match the testimony on
2    the pages he cites. Rather, the words "suspect" and "someone" were used in the broadcast,
3    according to the pages cited by Turner. (Ans., Clerk's Transcript, Dkt. No. 16-1 at 98-
4    100.) Men did testify at the preliminary hearing that an officer said, "they catch the guy
5    and [wanted to] take me to identify." (*Id.* at 57.)

6    Sergeant Noa told Men he "wanted her to look at the subject to — to see if she
7    could identify if it was the person who came into the store." (*Id.*, Reporter's Transcript,
8    Dkt. 16-19 at 30.) They drove to the detention location, but before they arrived for the
9    show-up, Noa gave her an admonition.[4] (*Id.* at 30-31.) Men testified that Sergeant Noa
10   told her that "they may have caught the person," and that he wanted her "to go and confirm
11   if it is the right person." (*Id.*, Reporter's Transcript, Dkt. No. 16-16 at 77.) She also
12   testified that Noa informed her that she was "not obligated to identify anybody" and that
13   "the investigation would continue regardless of whether or not you were able to identify
14   someone." (*Id.* at 90.) When asked at trial whether she would have told Noa that the
15   detained suspect was not the person who robbed the store, she said, "Yes." (*Id.* at 90-91.)

16   Men testified that at the show-up she recognized the person as the perpetrator, his
17   pants, and his underwear. (*Id.* at 78-79.) Before getting out of the car for the show-up,
18   Sergeant Noa drove her around twice so that she could see other perspectives of the
19   suspect. (*Id.* at 62-63.) During one of these when the suspect turned his head Men got a
20   "full view of his face" and identified him. (*Id.*; Dkt. No. 16-19 at 37-38.) At trial Men
21   identified Turner as the perpetrator, and identified his distinctive underwear from
22   photographs. (*Id.*, Reporter's Transcript, Dkt. No. 16-16 at 25, 55-56.)

23   Turner raised his identification claim only on collateral review to the state appellate
24   and supreme courts, both of which summarily denied the claim. When presented with a
25   state court decision that is unaccompanied by a rationale for its conclusions, a federal court

---

[4] A recording of the in-field admonition was played for the jury, but the parties stipulated that the court reporter did not need to transcribe it. (Ans., Dkt. No. 15-1 at 16.) Respondent notes that the "recording and transcript of the recording, People's Exhibits 99A and 99B, were not included in the record on appeal." (*Id.*, n.5.)

8

must conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not de novo. "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Due process may require suppression of eyewitness identification evidence if law enforcement procured the identification using unnecessarily suggestive procedures. *Perry v. New Hampshire*, 565 U.S. 228, 238-239 (2012). "Instead of mandating a per se exclusionary rule," the U.S. Supreme Court has held that the Due Process Clause "requires courts to assess, on a case-by-case basis whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

Reliability is the "linchpin" of that evaluation. *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). The factors a court should consider are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Braithwaite*, 432 U.S. at 114. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* "Where the 'indicators of [a witness's] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.*

Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Van Pilon v. Reed*,

799 F.2d 1332, 1338 (9th Cir. 1986). An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985); *see, e.g., United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender); *Bagley*, 772 F.2d at 493 (repeated showing of picture of individual impermissibly reinforces image of picture in mind of viewer).

"[A] show-up is a permissible means of identification without requiring a showing of exigency." *United States v. Kessler*, 692 F.2d 584, 585 (9th Cir. 1982). "Although a show-up is more suggestive than a lineup because the suspect is the only person presented for identification, returning a suspect to the scene of a crime shortly after its commission to determine whether eyewitnesses identify him as the perpetrator permits the witnesses to make the determination while the image of the perpetrator is still fresh in their minds, and may lead to the expeditious release of innocent suspects." *Id.*; *see also Kessler*, 692 F.3d at 585 (asking bank tellers to view a robbery suspect returned to the bank in handcuffs an hour later was not an unnecessarily suggestive procedure.); *Sanchez v. Hedgpeth*, 706 F.Supp.2d 963, 1000 (C.D. Cal. 2010) ("a one-person field line-up was appropriate because the police had detained a man they believed to be the perpetrator that held a gun to Schmidt's head at the location the victims had identified as the scene of the crime."); *Ramirez v. Taylor*, 103 F. App'x 248, 250-251 (9th Cir. 2004) (state court's rejection of claim that curbside identification was impermissibly suggestive not contrary to federal law because "the admission of evidence of a showup without more does not violate due process."); *United States v. Bagley*, 772 F.2d 482, 492-493 (9th Cir. 1985) (taking suspect to the bank to present to the letter within an hour and a half of a bank robbery was a legitimate identification procedure).

Habeas relief is not warranted here. The state court reasonably rejected Turner's

1   claim because the pretrial encounter was not so suggestive as to violate due process. *Van*
2   *Pilon*, 799 F.2d at 1338. Men, with the details fresh in her mind, described the person and
3   his clothing prior to the show-up, which occurred roughly three and a half hours after the
4   crime occurred. Also, she was read an admonition before she saw the suspect at the show-
5   up, which cautioned her that she was not obligated to identify anyone and that the
6   investigation would continue whether or not there was an identification. Furthermore, she
7   was twice driven around the suspect so that she could see him from different perspectives.

   The state court also reasonably rejected this claim because the identification was
sufficiently reliable to outweigh any possibly corrupting effects arising from the procedure.
*Id.* Men had a long interaction with the suspect, including the time when she thought he
was only a customer; she identified his clothing and his car before being shown the suspect
or the photograph of the car; and she unequivocally identified Turner as the person who
committed the robbery. *Braithwaite*, 432 U.S. at 114 (a court should consider "the
opportunity of the witness to view the criminal at the time of the crime, the witness' degree
of attention, the accuracy of his prior description of the criminal, the level of certainty
demonstrated at the confrontation, and the time between the crime and the confrontation.")
Turner's contention that the radio broadcast stated "the person responsible had been
caught" before Men attended the show-up does not change this conclusion. First, his
contention is not supported by the pages of the transcript he cites. Second, even if there
had been such language, its effect would have been undone by the fact that Men received
an admonition, had identified the suspect's clothing and car before the line up, and made a
confident identification of Turner.

   Furthermore, show-ups within a short amount of time after the crime have been
upheld as constitutional because they permit "the witnesses to make the determination
while the image of the perpetrator is still fresh in their minds, and may lead to the
expeditious release of innocent suspects." *Kessler*, 692 F.3d at 585.

   Upon an independent review of the record, I conclude that the state court's denial of
the claim was not objectively unreasonable and is entitled to AEDPA deference. This

11

claim is DENIED.

### iii. Claim of Ineffective Assistance

Turner claims trial counsel Gerritt Rutgers rendered ineffective assistance by (i) refusing to be interviewed by an investigator Turner had hired, but instead contacted the investigator to dissuade him from taking the case and to disclose sensitive information; (ii) failing to object to the allegedly suggestive identification procedure; (iii) failing to make an adequate investigation, failing to make informed and reasoned decisions about the defense, and conducting an inadequate defense; and (iv) harboring "ill-will, spite, and animus toward petitioner at the time of trial to such a degree and depth that it compromised petitioner's defense" as shown by two post-trial emails between Rutgers and Turner's uncle. (Pet., Dkt. No. 1 at 36-38.)

Turner raised these claims on collateral review to the state courts, which summarily denied them. I will conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *Delgado*, 223 F.3d at 982.

To prevail on a claim of ineffectiveness of counsel, a petitioner must establish that (1) counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984), and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. When the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (citing *Strickland*, 466 U.S. at 693).

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks and citations omitted). "The question [under § 2254(d) ] is not whether counsel's

12

actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### (i) Refusing to Consent to Interview With Investigator

Turner claims that he asked trial counsel Garrett Rutgers to consent to an interview with the private investigator Turner hired but that Rutgers refused. (Pet., Dkt. No. 1 at 37.) Turner states he wanted "an explanation of counsel in not making a pretrial challenge to the identification by the victim of the Verizon store . . . on the ground the identification was tainted by the police use of impermissively [*sic*] suggestive procedures." (*Id.*)

Nothing in these allegations shows that Rutgers rendered a deficient performance that caused prejudice. First, Rutgers's alleged refusal occurred <u>after</u> trial. Turner cannot show that this alleged refusal constituted a deficient performance at trial or that it affected the proceedings. Second, the facts are not as Turner represents them. In an email Rutgers sent to Turner's uncle, he states that he "spoke to the investigator who was not committed to reviewing this case, as he has only been paid $500.00, which is hardly enough to review a case that was pending for years." (Pet., Dkt. No. 1-1 at 7, 9.) It is unlikely that the investigator would have accepted or carried out any instructions from Turner, such as attempting to interview Rutgers, before he had accepted the assignment. In fact, he ultimately declined to take up the case and stated that he had not cashed the $500.00 money order he had been sent. (Pet., Email from Investigator, Dkt. No. 1-1 at 12.)

Upon an independent review of the record, I conclude that the state court's denial of the claim was not objectively unreasonable and is entitled to AEDPA deference. This claim is DENIED.

### (ii) Failure to Object

Turner alleges counsel rendered ineffective assistance by failing to object to the use of an allegedly impermissibly suggestive identification procedure. (Pet., Dkt. No. 1 at 37-39.) As discussed above, counsel likely did not raise any objection because he knew any such objection would have been overruled. Show-ups are permissible and any alleged harm caused by the radio traffic was undone by the admonition given to Men. It is both

reasonable and not prejudicial for an attorney to forgo a meritless objection. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Also, there was no prejudice because Men's identification was reliable. She described Turner, his underwear, and his car before she came to the show-up.

Upon an independent review of the record, I conclude that the state court's denial of the claim was not objectively unreasonable and is entitled to AEDPA deference. This claim is DENIED.

### (iii) Failure to Investigate or Present an Adequate Defense

Turner states in a conclusory fashion that trial counsel "unreasonably and prejudicially failed to conduct a timely or adequate investigation, did not make informed and reasoned decisions regarding the presentation of the defense case, and did not adequately defend against the State's case." (Pet., Dkt. No. 1 at 37.) Because he fails to provide any specific instances or evidence that counsel failed to investigate or prepare a defense, Turner's claim fails. Rather than posing general allegations, a federal habeas petition "is expected to state facts that point to a real possibility of constitutional error." *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (internal quotation marks and citation omitted). Conclusory allegations are not sufficient. Upon an independent review of the record, I conclude that the state court's denial of the claim was not objectively unreasonable and is entitled to AEDPA deference. This claim is DENIED.

### (iv) Animus

Turner claims two post-trial emails between trial counsel Rutgers and Turner's uncle show that trial counsel "harbored ill-will, spite, and animus toward petitioner at the time of trial to such a degree and depth that it compromised petitioner's defense." (Pet., Dkt. No. 1 at 36.)

In the first email, Rutgers discusses several "problems": (i) he "spoke to the investigator who was not committed to reviewing this case, as he has only been paid $500.00, which is hardly enough to review a case that was pending for years"; (ii) "I already provided Tajiri with all of the reports"; (iii) my file is electronically stored at this

14

point. I will NOT be printing it off for free. The hours and resources involved is cost prohibitive"; (iv) "all of Tajiri's appeals have been exhausted"; (v) "Tajiri's 'newly discovered evidence' is not new. He was simply refusing to disclose it to trial counsel (me) at the time his case was pending for trial . . . Refusing to disclose evidence to your own attorney does not set up a later claim for 'newly discovered evidence'"; and (vi) "I would estimate over 300K was spent on Tajiri's defense, which Tajiri squandered by misdirecting his attorney, his investigators, his appellate lawyer, and now it would seem, you."[5] (Pet., Dkt. No. 1-1 at 7, 9.)

In the second email Rutgers thanks Turner's uncle "for informing me you are reporting me to the State Bar": "I also want to thank you for pointing out you have been involved in robberies, as I am sure the State Bar will be interested in that. How reporting me helps your nephew is unclear at best." (*Id.* at 15.)

The Sixth Amendment does not entitle the accused to have a "rapport" or a "meaningful relationship" with his attorney. *McGill v. Shinn*, 16 F.4th 666, 690 (9th Cir. 2021) (rejecting claim counsel was ineffective for failing to develop a relationship of trust or rapport with the accused and his family). Furthermore, to show prejudice, a petitioner must show that counsel is "burdened by an actual conflict of interest" and that that "actual conflict of interest adversely affected [the] lawyer's performance." *Strickland*, 466 U.S. at 692.

Habeas relief is not warranted here. If the emails reveal animus, the animus appears to have arisen from events that occurred after trial. They are not indications of counsel's feelings or thoughts about Turner during trial and cannot be evidence of how he handled the defense. Furthermore, Turner has not tied any specific errors of counsel attributable to the alleged animus.

Upon an independent review of the record, I conclude that the state court's denial of

---

[5] Respondent notes that "[n]o date is visible in the first email, but emails between the investigator and petitioner's uncle regarding a $500 money order written in October and November of 2019 indicate that Rutgers's email was written during the same timeframe. Dkt. No. 1-1 at 7, 9, 12-13." (Ans., Dkt. No. 15-1 at 20.)

1  the claim was not objectively unreasonable and is entitled to AEDPA deference. This
2  claim is DENIED.

### iv. Presentation of False Evidence

Turner claims that the police manipulated evidence and that the use of this manipulated and falsified evidence violated his due process rights. (Pet., Dkt. No. 1 at 39-42.) He contends (i) Officer Chamberlain "staged the evidence when taking pictures of the keys in the ignition"; and (ii) Chamberlain failed to take a photograph "to document the original state or condition" of evidence found in the car, specifically a duffel bag, its contents, and clothing found underneath the duffle bag. (*Id.* at 40-41.)

Turner raised these claims on collateral review to the state courts, which summarily denied them. Therefore I will conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *Delgado*, 223 F.3d at 982.

The prosecution's knowing use of false evidence constitutes a violation of due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To establish a due process violation based on the government's use of false evidence, petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). "The essence of the due process violation is misconduct by the government, not merely perjury by a witness." *Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004). Habeas relief is not available if a petitioner fails to set out a "factual basis for attributing any misconduct" or "any knowing presentation of perjury" by the government. *Id.*

### (i) Photograph of Keys

Turner claims "[t]he testimony of Officer Chamberlain is unequivocal that she staged the evidence when taking pictures of the keys in the ignition." (Pet., Dkt. No. 1 at 40.) He bases this on Sanford's declaration that he left the keys under the front passenger seat; Turner's subsequent retrieval of the keys; and his having the keys on his person when he was apprehended. (*Id.*)

16

1   Turner has not shown Chamberlain falsified evidence or that false evidence was
2   presented. Chamberlain merely testified that the keys were in the ignition when she took
3   photographs of the car, and that she did not recover the keys herself. (Ans., Reporter's
4   Transcript, Dkt. No. 16-17 at 1750.) The keys had been placed there by other officers;
5   Chamberlain merely took photographs of what was already there. Trial testimony supports
6   this. Sergeant Rodenspeil testified he got the keys from Detective Manion, used them to
7   unlock the car door, put them in the ignition but did not start the car, and then gave the
8   keys to Sergeant Noa. (*Id.*, Dkt. No. 16-18 at 21-23.) Noa testified he put the keys in the
9   ignition to see if they fit and that he "probably" just left them there. (*Id.*, Dkt. No. 16-19 at
10  41.) Furthermore, Turner bases his contention on Sanford's affidavit, which was rejected
11  by the resentencing court as not credible, a factual determination this Court must presume
12  as correct. Turner also has not shown how such evidence is material.
13  Upon an independent review of the record, I conclude that the state court's denial of
14  the claim was not objectively unreasonable and is entitled to AEDPA deference. This
15  claim is DENIED.

### (ii) Photograph of Duffel Bag Evidence

17  Turner claims Officer Chamberlain failed to take a photograph of the original state
18  of certain evidence, in particular a duffel bag, whose contents she emptied out prior to
19  taking the photograph, and clothing found under the duffel bag. (Pet., Dkt. No. 1 at 41.)
20  Turner's assertion is not supported by the testimony of Chamberlain, who testified that she
21  photographed the car as it had been left. (Ans., Reporter's Transcript, Dkt. No. 16-17 at
22  168-169.) She admitted a later photograph of the contents of the duffel bag was "staged,"
23  but that simply meant the method of documenting what was found. (*Id.* at 188.) Turner
24  thus has not shown the evidence was false or falsified. Nor has he shown how the
25  evidence, even if false, was material. Upon an independent review of the record, I
26  conclude that the state court's denial of the claim was not objectively unreasonable and is
27  entitled to AEDPA deference. This claim is DENIED.

## CONCLUSION

The state court's adjudication of Turner's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Turner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

Turner's motion to expedite consideration of the traverse is DENIED as moot. (Dkt. No. 20.)

The Clerk shall terminate all pending motions, enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

**Dated:** March 21, 2022



WILLIAM H. ORRICK
United States District Judge